IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

PAM ALLEN,                          )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )        CASE NO. CV 01-B-2817-S
                                    )
AMDAHL CORPORATION; et al.,         )
                                    )
        Defendants.                 )

**ENTERED**
APR - 1 2004

## MEMORANDUM OPINION

This case is currently before the court on Motions for Summary Judgment filed by

defendants, Amdahl Corporation, DMR Consulting Group Long Term Disability Plan

["DMR Plan"], and Provident Life and Accident Insurance Company ["Provident"]. Plaintiff

Pam Allen has sued defendants, alleging that they wrongfully denied her claim for long-term

disability benefits under a qualified ERISA plan.  Upon consideration of the record, the

submission of the parties, the arguments of counsel, and the relevant law, the court is of the

opinion that the Motion for Summary Judgment filed by Amdahl Corporation, (doc. 39), will

be granted; the Motion for Summary Judgment filed by defendant the DMR Plan, (doc. 42),

will be granted; and the Motion for Summary Judgment filed by defendant Provident, (doc.

36), will be denied and judgment entered in favor of plaintiff and against Provident.

## I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record

shows "that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the



initial burden of showing no genuine issue of material fact and that it is entitled to judgment

as a matter of law.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see*

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met this

burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that

there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S.

317, 324 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986).

     In deciding a motion for summary judgment, the court's function is not to "weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine

issue for trial."  *Id.* at 249.  Credibility determinations, the weighing of evidence, and the

drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the

non-moving party is to be believed and all justifiable inferences are to be drawn in her favor.

*See id.* at 255.  Nevertheless, the non-moving party need not be given the benefit of every

inference but only of every ***reasonable*** inference.  *See Brown v. City of Clewiston*, 848 F.2d

1534, 1540 n.12 (11th Cir. 1988).

## II. <u>STATEMENT OF FACTS</u>

     Plaintiff Pam Allen was employed as a Senior Management Consultant by DMR

Consulting Group, Inc., a subsidiary of Amdahl Corporation.  (Doc. 13 ¶ 7; doc. 49, Ex. 1

¶ 2.)  As an employee of DMR, plaintiff was covered by a group long-term disability

insurance policy issued by defendant Provident.  (Doc. 38, Ex. 1 ¶ 2.)  This policy was part

2

of an employee welfare benefit plan governed by the Employee Retirement Income Security Act ["ERISA"].  The policy provides coverage for a "disability," which is defined by the policy (1) as the inability "to perform all the material duties of [one's] own occupation on a full-time or part-time basis because of an Injury or Sickness that started while insured under [the] policy" during her "own occupation period;" or (2) as the inability "to work in any occupation for which they are or may become suited by education, training, or experience" during the "any occupation period." (Doc. 38, Ex. 3 at 10.)  The "Own Occupation Period" begins on the date benefits become payable under the terms of the policy and continues for two years; the "Any Occupation Period" begins on the day following the expiration of the "Own Occupation Period." (*Id*. at 5, 9.)

The DMR Plan provides Provident with "full, exclusive, and discretionary authority to control, manage, and administer claims, and to interpret and resolve all questions arising out of the administration, interpretation, and application of this Policy." (*Id*. at 26.) Provident's decisions are "conclusive and binding." (*Id*.)

In April 1998, plaintiff sought treatment for syncope and tachycardia. (Doc. 38, Ex. 2 at 179.) In July 1998, her treating physician noted, "She is having clear frank syncope, and it is quite worrisome.  It is going to be very difficult to catch an episode unless it were to be more frequent." (*Id*. at 182.) Sometime between July 1998 and June 1999, Noah Fitzpatrick, M.D., plaintiff's treating physician, diagnosed plaintiff with dysautonomia. (*See id*. at 182, 193.) On August 28, 1998, Dr. Fitzpatrick prescribed a Tilt-Table study. (Doc. 49, Ex. 5 at

185.)  A Tilt-Table study was performed by Dr. Cecil Coghlan in 1998, and the results were

positive for dysautonomia.  (*See* doc. 49, Ex. 3 at 2.)  Dr. Coghlan noted:

> Abnormal autonomic reflex regulation (dysautonomia) characterized
> fundamentally by orthostatic intolerance with a very unstable heart rate
> response that oscillated very markedly during tilt accompanied by orthostatic
> hypotension. . . . The type and degree of autonomic dysfunction documented
> in these tests clearly creates a propensity to syncope in the upright position.

(*Id.*)  Dr. Fitzpatrick noted that plaintiff's "[r]ecently diagnosed dysautonomia" was

"probably the cause of her syncopal episodes."  (Doc. 49, Ex. 5 at 185.)

In addition to the fainting episodes, plaintiff suffered other symptoms as a result of

her dysautonomia and other physical conditions.  These included blood pressure fluctuations,

swelling in extremities, difficulty concentrating, writing, and reading; migraine headaches;

excessive fatigue; and difficulty expressing herself.  (Doc. 38, Ex. 2 at 339; *see also id.* at

524.)

On June 8, 1999, less than a year after her diagnosis of dysautonomia, plaintiff

suffered an on-the-job injury.  She was struck on the back of her head by a presentation board

that had fallen off the wall.  (*Id.* at 7; *see also* doc. 49, Ex. 1 ¶¶ 6-7.)  Plaintiff was taken to

the hospital where she was treated for injuries that arose from this accident.  (*See* doc. 38, Ex.

2 at 7, 148.)

Following the accident, plaintiff suffered persistent pain in her jaw, neck, and

shoulder.  (*Id.* at 12.)  Her treating physician noted, "The medications used to treat

[plaintiff's] pain have contributed to the challenge of stabilizing her dysautonomia since the

antiinflammatories cause fluctuations in blood pressure and increase of her edema which has

resulted in periodic use of diuretics and potassium supplements all of which [have] an impact on her other medical conditions." (*Id.*)

Following her accident, plaintiff was evaluated on February 10, 2000, by Roland Rivard, M.D. (*Id.* at 60-62.)  Dr. Rivard evaluated plaintiff's "Cervical Spine and Right Upper Extremity." (*Id.* at 62.)  Based on the injury to her neck and shoulder, Dr. Rivard found plaintiff's ability to work was restricted as follows:

> 1.  Standing (Remaining on one's feet in an upright position at a work station without moving about) and/or Walking (Moving about on foot):  Thoses two activities combined should be limited to frequent (2/3 of a normal 8 hour shift . . . .)
>
> 2.  Sitting (Remaining in the normal seated position):  No limitation, although she should be permitted to stand up from normal sitting position occasionally in order to stretch her back and her cervical spine.
>
> 3.  Lifting (To exert physical strength necessary to move objects from one level to another):  Maximum lift of 50 lbs.  Maximum frequent lift of 20 lbs.  This would place the examinee in the  . . . Lifting Category of "light to medium."
>
> 4.  Carrying (Transporting of an object, usually holding it in the hands or arms):  Should be able to carry loads of up to 20 lbs frequently for short distances.
>
> 5.  Climbing (To ascend or descend ladders, scaffolding, stairs, poles, inclined surfaces):  Can climb stairs occasionally.  Should not climb ladders due to condition of her neck and right shoulder.
>
> 6.  Balancing ([T]o maintain body equilibrium to prevent falling when walking, standing, crouching, or running on narrow, slippery, or erratically-moving surfaces):  Should not do that activity
>
> 7.  Stooping (Bending the body downward and forward by bending the spine at the waist):  Should not do that activity but this is due to the condition of her back and not to the condition of her cervical spine or shoulder.

8. Kneeling (Bending the legs at the knees to come to rest on the knee or knees): Can do frequently.

9. Crouching (Bending body downward and forward by bending legs and spine): Can do frequently.

10. Squatting (Bringing body downward by bending legs, knees, and hips): Can do occasionally, but this is not due to the condition of her neck and shoulder, but due to some discomfort in her knee.

11. Reaching (extending the hand(s) and arm(s) in any direction): No limitation for left upper extremity. For right extremity, should reach at the level of her head only occasionally

12. Handling (includes seizing, holding, grasping, and turning): No limitation.

13. Fingering (picking, pinching, or otherwise working with the fingers primarily): Should be limited to frequent for activities such as keyboard operation.

(*Id.*)

Plaintiff returned to work on a part-time basis thirty days after the accident. (*Id.* at 300.) However, thereafter, plaintiff determined that she was not able to work, and she filed an application for long-term benefits with Provident in April 2000. (*See* doc. 49, Ex. 1 ¶¶ 9-10.)

On or about June 29, 2000, Carrie Ashton, a Provident employee, reviewed plaintiff's medical records and determined, "Based on the information in the file including the full independent medical examination with functional capacity evaluation the restrictions are supported as of 02/10/00. Physical therapy notes may be used to clarify actual ongoing functional capabilities." (Doc. 38, Ex. 2 at 286-87.) She also noted:

6

> Ms. Allen's employer has provided a description of job duties and stated that lifting/carrying up to 100 pounds is required. The specific duties requiring lifting are unclear. [Plaintiff] has indicated on the 04/07/00 claimant statement that she has had to "pay more for assistance from skycaps, drivers, bellmen, etc., . . . drivers have to meet me inside the airport to assist with luggage.'" However, it is unclear to me whether Ms. Allen's travel accommodations have allowed her to return to work in her occupation . . . .

(*Id.* at 286.)

On or about July 26, 2000, while Provident was processing plaintiff's claim, DMR Consulting informed Provident that plaintiff had returned to work full time on April 16, 2000. (Doc. 38, Ex. 2 at 296.) Therefore, Provident denied plaintiff's claim for continuing benefits. (*See* doc. 49, Ex. 5 at 299-300.) However, in fact, plaintiff had not returned to work on a full time basis. (*See id.* at 303.) Upon receiving the letter denying her claim for benefits, plaintiff contacted Provident and told its representative that she had not actually returned to work full time. (*See id.* at 302-03; 317-19.) Provident's representative told plaintiff that Provident would order updated medical records; she also told plaintiff that Provident would need a letter of appeal from plaintiff stating why she disagreed with Provident's decision to deny her claim for benefits. (*Id.* at 319.) Provident's representative told plaintiff that she would send plaintiff a letter telling her the information Provident needed. (*Id.* at 317.)

On August 7, 2000, Provident sent plaintiff a letter asking for medical documentation of her limitations and restrictions, and a "detailed status of your current condition." (*Id.* at 325.) It also asked for "documentation showing [plaintiff's] actual work earnings . . . along with documentation showing actual benefit amounts [plaintiff had received] from all other

sources." (*Id.*) The letter further stated that Provident had requested updated medical records from Dr. Fitzpatrick. (*Id.*)

Three days later, plaintiff sent Provident a three-page appeal letter describing her limitations. (*See id.* at 338-40.) This letter indicated that plaintiff had attempted to work part time and had attempted to limit her travel as an accommodation of her limitations. (*Id.* at 340.) Plaintiff's letter also stated:

> Trying to accommodate these symptoms by not flying, working limited hours, or remaining local did not produce either relief of the symptoms [or] a stabilized medical situation. My ability to work goes up and down. One day I may be able to make it 1-2 hours and the next 4-5 hours. But then the following day I may end up in bed for the entire day. On many occasions while and after working I have experienced major fluctuations in my blood pressure, heart rate, and increased pain. There is no consistent pattern due to my medical complications and loss of stamina. Since 6/8/99 there has been a 50-70% loss in stamina depending on the day. When I have a migraine it is a total loss.
>
> Even after short periods of time exerting myself, i.e. walking in a store, standing in line, driving a car I have an immediate onset of zero strength/stamina (it feels like I hit a wall) and I have to quit whatever I am doing and go home and rest immediately. As a result, I try not to go out alone and drive as little as possible.
>
> Another great challenge is sudden onset of gastrointestinal problems. This has not been tied to any particular food product or activity.

(*Id.*) She also listed the "most frequent symptoms [she] struggles with on a daily basis," (*id.* at 339); these symptoms included"

- Blood pressure fluctuations daily . . .

. . .

- Difficulty concentrating

8

- Difficulty writing

- Difficulty reading

- Sudden onset of severe migraines which cause visual disturbances and vomiting . . .

. . .

- Excessive fatigue

- Inability to concentrate . . .

- Difficulty expressing thoughts that are formulated in [her] mind

- Memory difficulty

- Visual disturbances – tunnel and blurred

- Heart fibrillation

- Blacking out and being injured by falls . . .

- Gastrointestinal problems – diarrhea; extreme reactions to food

- Restrictions lifting

- Restrictions walking

- Restrictions climbing stairs

- Unable to bend head back and look up – results in tunnel and blurred vision and becomes very dizzy and nauseated

- Have jaw pain and right side headaches when I eat solid foods

- Incontinence

(*Id.* at 339.)  Plaintiff's appeal letter also listed 18 different medications she used, on a full-

time or as needed basis.  (*Id.* at 338.)

9

On August 28, 2000, Dr. Fitzpatrick wrote Provident, stating:

Mrs. Allen is a patient of mine. I began seeing her in July 1998. At that time, she was diagnosed with dysautonomia with the primary problem being fluctuation in blood pressure, heart rate, and syncope. This was documented by a tilt study read by Cecil Coghlan. Her condition stabilized with medication. In fact, she was seen in December 1998 with a respiratory illness. Otherwise, she was doing well, and was not seen again until June 10th after she had sustained a trauma to her head. **Since that time she has had approximately 15 office visits for various problems related to this. It is my opinion that this trauma has indeed worsened her dysautonomia. In addition, the treatment for her pain and injury has complicated the matter too with medications causing problems with fluid retention and blood pressure.** She is still undergoing treatment for these conditions. In fact, I am trying to arrange for her to see a doctor in North Carolina who specializes in dysautonomia related to brain stem and spinal injuries. **She continues with physical therapy and is unable to perform her usual previous duties of her job that she was doing prior to her injury. I believe the medical record is quite clear that she continues to suffer from this injury and the other problems that this has caused with her other medical problems.**

(Doc. 49, Ex. 5 at 373.)(emphasis added). On September 5, 2000, plaintiff sent Provident the letter from Dr. Fitzpatrick to Provident with a memorandum indicating that she was continuing to have problems with blackouts and that she had been "required to resort to minimal activity and to remain in [her] home location." (*Id*. at 374.)

Plaintiff's file was referred for medical review. Burton McDaniel, M.D., reviewed plaintiff's file on or about October 23, 2000, assessing the primary diagnosis that plaintiff had dislocated her fifth cervical vertebrae in the accident involving the presentation board. (Doc. 38, Ex. 2 at 422.) He concluded, "The objective findings contained in the medical records do not support restrictions and limitations asserted by insured/[attending physician]

10

that would prevent the insured from working [on] a part-time or full-time basis in regards to gainful employment." (*Id.*) Dr. McDaniel did not address plaintiff's other medical problems.

Based on the administrative record and Dr. McDaniel's review, Provident affirmed its decision denying plaintiff's claim for benefits on November 29, 2000. (*Id.* at 426.) On December 12, 2000, Dr. Fitzpatrick wrote to Provident stating that plaintiff's condition had "worsened" and that she "is unemployable, is disabled, and cannot work." (Doc. 49, Ex. 5 at 432.)

Because plaintiff was continuing to have problems with syncope, she continued to seek treatment in an effort to resolve the problems. For example in October 2000, she had additional tests performed by Dr. Coghlan. (Doc. 38, Ex. 2 at 480.)  The tests were performed while plaintiff was under the influence of her medications. (*See id.*) Dr. Coghlan found "[n]o evidence of autonomic failure in the screening tests," but he noted that plaintiff's medications likely affected the results of the test. (*Id.* at 479-80.)

On December 28, 2000, plaintiff was seen for further testing by Dr. David Robertson and Dr. Terry Ketch at the Autonomic Dysfunction Center at Vanderbilt University. (*See id.* at 484, 520-22.) The tests were performed while plaintiff was taking her regular medications. (*Id.* at 521.) Drs. Ketch and Robertson recommended a "possible admission in future to Autonomic Dysfunctional Center off medications." (*Id.* at 520.)

Provident sent plaintiff's file to Dr. McDaniel for review again on December 14, 2000.  (Doc. 49, Ex. 5 at 441.) On January 21, 2001, Dr. McDaniel reported:

11

> Pam Allen is a 53 year old Assistant Director whose file was previously reviewed on 10-23-00. Additional objective information supplied since that review is Limited [sic]. Claimant contends that the problems with her dysautonomia is the limiting factor, yet limited objective documentation of Blood Pressure changes are in file. CONCLUSION: Dysautonomia is outside the scope of this consultant.

(*Id.*)

On January 4, 2001, Provident referred plaintiff's file for review by a cardiologist. (Doc. 38, Ex. 2 at 445.) Dr. Tom Hashway reviewed plaintiff's file, focusing on dysautonomia. (*Id.* at 448-50.) He stated in his report:

> The diagnosis of "dysautonomia" is questionable. The attached reprint indicates that autonomic neuropathy (also known as dysautonomia) usually is a manifestation of a more generalized neuropathy. However, such a situation does not exist with this claimant. Indeed, she had a normal nerve conduction study of both upper extremities on 9/22/99, according to Carrie Ashton's review. Additionally, dysautonomia implies more involvement than simply blood pressure changes. There is often anhidrosis, hypothermia, bladder atony, obstipation, dry mouth, dry eyes, and blurred vision, none of which I saw described in the portions of the file I reviewed.

(*Id.* at 450.) Dr. Hashway further noted that Dr. Fitzpatrick in his appeals letter mentioned "blood pressure fluctuations and passing out spells with prolonged standing as possible limiting factors." (*Id.*) Dr. Hashway noted "[b]lood pressure fluctuation is a normal and constant phenomenon." (*Id.*) Dr. Hashway noted that Dr. Fitzpatrick's office notes reflected the following blood pressures: "140/90 on 4/3/00; 140/85 on 5/1/00; 150/100 on 5/25/00; 138/92 on 6/28/00; 170/90 supine and 140/80 standing on 7/28/00." (*Id.* 450, 448.) Dr. Hashway observed, "Thus, recently recorded blood pressures are not highly variable and are acceptable for full-time employment in any capacity." (*Id.* at 448.)

Dr. Hashway's statement that the diagnosis of dysautonomia was questionable was based on an excerpt from DISEASES OF THE PERIPHERAL NERVOUS SYSTEM (hereinafter "Excerpt"), which he attached to his report. (*Id.* at 450, 446.) As plaintiff's counsel argued in plaintiff's Brief in Opposition, Dr. Hashway selectively chose from the variety of symptoms that were listed in the Excerpt. For example, the Excerpt listed symptoms of blurring of vision, episodic hypertension and diarrhea, all symptoms suffered by plaintiff. (*Id.* at 446, 339.)

Dr. Hashway discredited the plaintiff's statements that she passed out because "[t]he passing out spells are not described in any detail, nor are witnesses to such events described in the office notes I have reviewed. Thus the data on this point does not support the presence of an active current problem." (*Id.* at 448.) Dr. Hashway did not discuss the evidence in the record that plaintiff was still suffering severe symptoms. *See, e.g.,* doc. 49, Ex. 5 at 432 (letter from Dr. Fitzpatrick noting plaintiff "has severe fluctuations in blood pressure and heart rate . . . . She continues to have passing out spells . . . ."); *id.* at 506 (report of Drs. David Robertson and Terry Ketch noting systemic hypertension).

Dr. Hashway concluded that plaintiff "is able to perform the full-time duties of her own occupation, including standing/walking for 2/3 of the day for a 60 hour week. She is capable of any level of physical activity from a cardiac viewpoint." (Doc. 49, Ex. 5 at 448.)

After Dr. Hashway's initial review, plaintiff discovered that the records of Drs. Coghlan, Robertson, and Ketch were not in her claim file; she forwarded these records to Provident. (Doc. 38, Ex. 2 at 484.) On February 15, 2001, after Provident received the

13

additional medical records, it asked Dr. Hashway to review plaintiff's file again. (*Id.* at 485.) In requesting the review, the Provident representative reminded Dr. Hashway that his "previous review indicates specifically 'no [restrictions and limitations] regarding dysautonomia.'" (*Id.*)  Provident limited Dr. Hashway's subsequent review to whether the new medical records "would impact or change [Dr. Hashway's] previous assessment as it relates to [plaintiff's restrictions and limitations] as of April 2000 through August 2000." (*Id.*)

On February 28, 2001, Provident informed plaintiff that it was affirming its prior decision to deny her claim for benefits. (*Id.* at 494.)

> [B]ecause your restrictions and limitations are not clinically supported to the degree that they would preclude you from performing the duties of your occupation on a part-time and/or full-time basis, you do not meet the definition of disability as outlined in the contract.  Because you did not meet the definition of disability when you worked part-time (April - August 2000), you were not a covered employee.  Because you were no longer covered, your eligibility for benefits ceased.  Therefore, I find I have no other recourse, but to uphold the previous decision to deny benefits.
>
> Please note your administrative remedies have now been exhausted and no further reviews will commence.

(*Id.* at 491.)

Thereafter, on March 22, 2001, Dr. Fitzpatrick wrote Provident the following letter:

> This letter is regarding Pam Allen's condition that is clearly documented in [a] previous letter that I have written in her records which you have.
>
> Specifically, she cannot stand for long periods of time.  **Due to her dysautonomia, she passes out.  Because of these episodes and risk of injury, and in fact, she has injured herself because of this, she cannot be alone.  This has also affected her concentration.  Due to her illness, she**

14

**cannot fly or travel.** This causes further pooling of blood in her extremities and further orthostatic hypotension and worsening of her dizziness and syncope. This is intermittent and there is very little in the way she can do to predict these events and this makes it very difficult to be committed to deadlines and time restraints. **She can only walk minimal distance, and in fact, she uses handicap parking because if she walks for a distance, usually from regular parking spaces, she can black out and have syncope. It is uncontrollable and with very little warning. It is clearly documented on tilt study and is definitely pathologic and medical and has no psychiatric component to this.** She recently injured herself falling down stairs recently and was seen in the office on March 14th for this.

For this reason, she should not walk down stairs, especially alone. She should always use an elevator unless it was an extreme emergency such as a fire, and this would certainly even compromise her being able to emergently . . . leave a building.

On further note, because of the injury that she sustained on the job with the object hitting her head, she has continue [sic] pain and muscle spasm in her arm and shoulder and **cannot use a computer for any extensive length of time which will be required for most operations of any job**. She even continues with her extreme variation in blood pressure and heart rate and severe migraine headaches all related to this illness.

As you can see, **what most individuals would consider to be ordinary and normal functions of occupation, she cannot do.** Ordinary tasks are challenging and usually result in her inability to complete or accomplish these.
. . .

(*Id.* at 523-24.)(emphasis added). Plaintiff's counsel also wrote to Provident on June 14, 2001. (*Id.* at 528.) After receiving the letter from plaintiff's attorney, Provident reopened the administrative record and allowed another appeal of its decision. (*Id.* at 532.)

15

Provident also ordered "an [occupational] analysis as no [occupational] analysis was previously done."[1]  (*Id.*)  In a report dated, July 12, 2001, the Vocational Consultant decided that "the occupation of associate director/management consultant is most clearly reflected in the . . . occupations of Sales Representative, Computers and EDP Systems and User Support Analyst," which jobs are classified as sedentary and light work.  (*Id.* at 568.)  The job summary prepared on September 30, 1999 by DMR's worker's compensation carrier[2] after plaintiff's accident indicated that plaintiff's job required her to frequently carry heavy items (21-50 pounds), to stand and/or to walk frequently (1/3 to 2/3 of her day), to travel extensively, and to work 60 hours a week.  (Doc. 38, Ex. 2 at 64-66.)  This prior job summary may have been relied upon by Dr. Hashway in his January 2001 evaluation.  (*See id.* at 448 (noting plaintiff's job required her to stand and/or walk "for 2/3 of a day for a 60 hour week").)

Dr. Fitzpatrick received a letter from the Mitral Valve Prolapse Center of Alabama, following plaintiff's examination at the Center.  (Doc. 49, Ex. 5 at 681.)  The letter stated, "Because of her present symptoms, [plaintiff] is unable to work."  (*Id.*)  The letter stated:

> We very much enjoyed seeking Ms. Allen.  She is a very complicated, but also very interesting patient.  . . .

_____

[1]The court notes that Provident did review plaintiff's job duties in July 2000.  (Doc. 38, Ex. 2 at 295.)

[2]*See* doc. 49, Ex. 2 at 4 (plaintiff indicated on her application for disability benefits that she had received worker's compensation benefits from "Kemper National Services, Inc.") and *id.* at 66 (September 30, 1999 Job Summary prepared by Kemper Insurance Companies).

> In reviewing all of her data over a prolong period of time that we spent with
> Ms. Allen and her husband I am concerned about several things. She does not
> fit the classic picture of someone with either neurocardiogenic syncope or
> postural orthostatic tachycardia syndrome although she does have features of
> dysautonomia. In reviewing the event monitor that she had done she has some
> definite episodes of profound tachycardia and some other episodes that may
> well represent a more serious ventricular arrhythmia. I am concerned that this
> may be the cause of her spells and would suggest having an
> electrophysiological evaluation done by Dr. Neal Kay and his group at UAB.
> . . .

(*Id.*)

On June 2, 2001, the Social Security Administration determined that plaintiff had been

totally disabled since August 2, 2000. (*Id.* at 685.) This determination is included in the

Administrative Record.[3]

On August 15, 2001, Provident again sent plaintiff's file to Dr. Hashway for review.

(Doc. 38, Ex. 2 at 692-93.) Following his review, Dr. Hashway reported on September 17,

2001:

> The claimed impairment seems to be syncope. No witnessed syncopal event
> is described. No reproduction of the syncopal events have been made in a
> controlled setting, such as tilt table testing. *So, the syncope is self-reporting
> and not verified*. Additionally, the syncope seems to occur when the claimant
> has been standing for a prolonged period without premonitory warning
> symptoms. Finally, although her "syncope" has been present for several years

---

[3]"[A]pproval of disability benefits by the Social Security Administration is not
considered dispositive on the issue of whether a claimant satisfies the requirement for
disability under an ERISA- covered plan. *See Paramore v. Delta Air Lines, Inc.,* 129 F.3d
1446, 1452 n.5 (11th Cir. 1997). However, we have held that '[a] district court may consider
the Social Security Administration's determination of disability in reviewing a plan
administrator's determination of benefits.' *Kirwan v. Marriott Corp.,* 10 F.3d 784, 790 n.32
(11th Cir. 1994)." *Whatley v. CNA Ins. Companies,* 189 F.3d 1310, 1314 n.8 (11th Cir.
1999).

. . ., the pattern has been absent for extended periods "until June of 1999" when the syncopal episodes recurred after she was hit in the head at work.

The etiology of her "syncope" is unknown and unproven.  In his letter of 5/3/01, Dr. Watkins raises the question of ventricular tacharrhythmias and referral to an electrophysiologist.  *It would be interesting to get the event monitor report documenting this, including the original rhythm strips*.  Correlation with the claimant's diary during the test would also be useful.  In his report of 10/19/00, Dr. Coughlan documented "no evidence of autonomic failure in the screening tests."  He did suggest "orthostatic intolerance documented on the extended TILT."  In spite of her complaints of "syncope," the claimant stays physically active reportedly using a "bike 20 minutes 3 times weekly" on 5/3/01[4] and and [sic] "some swimming" on 7/28/00.[5]

In summary, *there is no objective evidence of either the presence of syncope or the mechanism of syncope*.  However, even if present and whatever the cause, *if present,* there seem to be adaptive possibilities present allowing the claimant to work.  If she knows that her symptoms occur with prolonged standing, then one obvious, common-sense solution is not to stand for a prolonged period.

In response to your questions, the new medical information submitted with her appeal does not support R&L's from 4/15/00 to the present.  The one possible R&L is no prolonged standing more than 10 consecutive minutes without sitting 2-3 minutes.  The one test that may support this R&L is the "orthostatic intolerance" documented above during extended TILT.  The Vanderbilt test would be helpful to obtain.  The insured has full-time capacity

---

[4]The reference to a report on May 3, 2001, apparently refers to a letter from Dr. Watkins at the Mitral Valve Prolapse Center as stating that plaintiff rides  a "bike 20 min 3 x week." (Doc. 38, Ex. 2 at 693 (the "CRS Summary" of the additional documentation states that Dr. Watkins wrote a letter stating that plaintiff was riding a bike for 20 minutes 3 times a week)).  The evidence before the court contains only the first page of this letter, and the first page does not mention the fact that plaintiff is riding a bicycle. (*See* doc. 49, Ex. 5 at 681.)

[5]On October 27, 2000, Dr. Fitzpatrick noted that plaintiff "continues with being very fatigued and tired.  She will do well for awhile and then 'hit a wall.'  She continues with her physical therapy, doing some swimming." (Doc. 38, Ex. 2 at 368.)

from 4/15/00 forward; **_the rational for this is the possibility of accommodation, in any setting, to preclude her presumed syncopal events_**.

(*Id.* at 695 (emphasis added; footnotes added).)

On September 19, 2001, Provident re-affirmed its denial of plaintiff's request for benefits on the basis of Dr. Hashway's report. (*Id.* at 703-04 (quoting Dr. Hashway's report).) Specifically, Provident found: "Because the medical records do not support restrictions and limitations to preclude Ms. Allen from working in her occupation, she does not meet the definition of disability and is not entitled to benefits." (*Id.* at 703) Provident told plaintiff that her "administrative remedies [had] been exhausted and no further reviews [would] commence." (*Id.*)

### III. DISCUSSION

### A. DMR CONSULTING GROUP LONG TERM DISABILITY PLAN

The Plan contends that it cannot be held liable for failure to pay benefits because it "did not have any involvement whatsoever with the decision to deny Plaintiff's claim for benefits." (Doc. 43 at 1.) The court agrees.

Section 1132(d)(2) provides, "Any **_money judgment_** under this subchapter against an employee benefit plan shall be enforceable only against the plan as an entity and shall not be enforceable against any other person unless liability against such person is established in his individual capacity under this subchapter." 29 U.S.C. § 1132(d)(2)(emphasis added). The Eleventh Circuit has held that Section 1132(d)(2) "contemplates legal relief and does not apply to an action to recover benefits under [29 U.S.C. § 1132(a)(1)(B), providing a cause

19

of action for the payment of benefits]." *Hunt v. Hawthorne & Assocs., Inc.*, 119 F.3d 888, 908 n.54 (11th Cir. 1997)("This provision [29 U.S.C. § 1132(d)(2)] contemplates legal relief and does not apply to an action to recover benefits under section 502(a)(1)(B)."), *cert. denied* 523 U.S. 1120 (1998). The court held:

> In *Blake v. Unionmutual Stock Life Ins. Co. of Am.*, we reasoned:
>
>> The nature of an action under section 502(a)(1)(B) is for the enforcement of the ERISA plan. Although the plaintiffs assert that they are claiming money damages, in effect they are claiming the benefits they are allegedly entitled to under the plan. Although . . . a money judgment would satisfy their demands, . . . only an order for continuing benefits would be sufficient. This is traditionally equitable relief . . . .
>
> 906 F.2d 1525, 1526 (11th Cir.1990).

*Hunt*, 119 F.3d at 907-08. "[A]n order enjoining the payment of benefits from an ERISA plan must issue against a party capable of providing the relief requested." *Id.* at 908. "Given the equitable nature of [plaintiff's] recovery-of-benefits claim under ERISA, . . . an *in personam* order enjoining the payment of benefits under section 502(a)(1)(B) must be directed to a person or entity other than the plan itself." *Id.*

The DMR Plan has no authority to issue or deny payment of benefits to plaintiff. To hold otherwise, and allow plaintiff's claim to go forward against the DMR Plan would require the court to "implicitly [rewrite] the Plan to give the [DMR Plan] that power." *Id.* at 911.

Because Provident is the party capable of providing plaintiff's claimed benefits, not the Plan, the Plan's Motion for Summary Judgment is due to be granted.

## B. AMDAHL CORPORATION

The claim for payment of benefits asserted against defendant Amdahl Corporation, the parent corporation of plaintiff's employer, will be dismissed for the same reason that the claim against the DMR Plan will be dismissed – that is that, under the terms of the policy, Provident has sole authority to make decisions regarding the payment of claims. Therefore, Provident, and not defendant Amdahl Corporation, is "the sole and proper real party defendant in this action challenging denial of benefits." *Jakoubek v. Fortis Benefits Ins. Co.*, No. 8:03CV290, 2003 WL 23214088, *6 (D. Neb. Oct. 29, 2003)(citing *Duckett v. Blue Cross and Blue Shield of Alabama*, 123 F. Supp. 2d 1286, 1292 (M.D. Ala. 2000)("employer was not a proper defendant where relief requested was insurance benefits which were denied by insurance company"))(footnote omitted).

Therefore, defendant Amdahl Corporation's Motion for Summary Judgment is due to be denied.

## C. PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY

The United States Supreme Court has held that, if a benefits plan gives the plan administrator or fiduciary discretionary authority to determine the eligibility for benefits and to construe the terms of the plan, a court reviewing the decision to deny benefits, challenged under § 1132 (a)(1)(B), should apply an abuse of discretion standard, also known as the arbitrary and capricious standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115

(1989);[6] *see also Jett v. Blue Cross & Blue Shield, Inc.*, 890 F.2d 1137, 1138 (11th Cir. 1989); *Guy v. Southeastern Iron Workers' Welfare Fund*, 877 F.2d 37, 38 (11th Cir. 1989). The language of the Plan at issue in this case, confers such "discretionary authority" on Provident; therefore, the arbitrary and capricious standard applies to Provident's decision to deny plaintiff's claim for benefits. *See Jett*, 890 F.2d at 1139 (finding discretionary authority conferred by plan which states "whenever the Claims Administrator makes reasonable determinations in the administration of the [Plan] . . . such determinations shall be final and conclusive"); *Guy*, 877 F.2d at 39 (finding requisite grant of authority where plan stated "'full and exclusive authority to determine all questions of coverage and eligibility'" as well as "'full power to construe the provisions of [the] Trust'").

---

[6]The Supreme Court held:

> Consistent with established principles of trust law, we hold that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. Because we do not rest our decision on the concern for impartiality that guided the Court of Appeals, . . . we need not distinguish between types of plans or focus on the motivations of plan administrators and fiduciaries. Thus, for purposes of actions under § 1132(a)(1)(B), the *de novo* standard of review applies regardless of whether the plan at issue is funded or unfunded and regardless of whether the administrator or fiduciary is operating under a possible or actual conflict of interest. Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a "facto[r] in determining whether there is an abuse of discretion." Restatement (Second) of Trusts § 187, Comment *d* (1959).

*Firestone Tire and Rubber Co.*, 489 U.S. at 115.

Provident ultimately pays benefit claims out of its assets. (*See* doc. 37 at 21.)  In this circuit, "when an insurance company serves as ERISA fiduciary to a plan composed solely of a policy or contract issued by that company, it is exercising discretion over a situation for which it incurs 'direct, immediate expense as a result of benefit determinations favorable to [p]lan participants.'"  *Brown v. Blue Cross & Blue Shield*, 898 F.2d 1556, 1561 (11th Cir. 1990)(quoting *de Nobel v. Vitro Corp.*, 885 F.2d 1180, 1191 (4th Cir. 1989)), *cert. denied* 498 U.S. 1040 (1991).  "The inherent conflict between the fiduciary role and the profit-making objective of an insurance company makes a highly deferential standard of review inappropriate." *Id*. at 1562.  Therefore, the court applies a ***heightened or modified*** arbitrary and capricious standard to its review of Provident's decision to deny benefits. *Id*. at 1563, 1568.[7]

A decision is arbitrary and capricious "if it is without reason, unsupported by substantial evidence, or erroneous as a matter of law." *Burke v. Kodak Ret. Income Plan*, 336 F.3d 103, 110 (2d Cir. 2003), *cert. denied*, ___ U.S. ___, 124 S. Ct. 1046 (2004); *see Skretvedt v. E.I. DuPont de Nemours & Co.*, 268 F.3d 167, 174 (3d Cir. 2001); *Brown v. Ret. Comm. of Briggs & Stratton Ret. Plan*, 797 F.2d 521, 525-26 (7th Cir. 1986). *cert. denied*

---

[7]The heightened arbitrary and capricious standard of review stands as a check "against the probability in many cases, and the danger in all cases, that the dictates of self-interest will exercise a predominant influence, and supersede that of duty." *See Michoud v. Girod*, 45 U.S. 503, 555 (1846), *quoted in Hughes v. Sec. & Exch. Comm'n*, 174 F.2d 969, 975, 975 n.12 (D.C. Cir. 1949)(stating "neither [the *Michoud* decision's] age nor its distinguishability can detract from the force and vigor of the general doctrine set out therein.").  "A conflicted fiduciary may favor, consciously or unconsciously, its interests over the interests of the plan beneficiaries." *Brown*, 898 F.2d at 1565.

479 U.S. 1094 (1987); *Schreck v. Reliance Standard Life Ins.*, 104 F. Supp. 2d 1373, 1376

(S.D. Fla. 2000); *see also Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1326-

27 (11th Cir. 2001)(decision was arbitrary and capricious because the evidence before

defendant did not demonstrate a "reasonable basis," and the record contained no "evidence"

that "contradicted" plaintiff's medical evidence).   The court finds Provident's decision to

deny plaintiff's claim for long-term disability benefits was "wrong from a perspective of *de*

*novo* review, and its self-interest in this case requires that [the court] determine whether the

claims decisions were arbitrary and capricious." *See Levinson*, 245 F.3d at 1327.

The court has reviewed the record evidence that was available to Provident at the time

it made its final decision, (*see generally* doc. 38, Ex. 2; doc. 49, Ex. 5), and concludes that

there was no reasonable basis for Provident to deny plaintiff long-term disability benefits.

Provident denied plaintiff's claims for benefits, ultimately, based on the report of Dr.

Hashway, a cardiologist retained by Provident to evaluate claims.   Dr. Hashway found:

> In summary, there is  no objective evidence of either the presence of syncope
> or the mechanism of syncope.  However, even if present and whatever the
> cause if present, there seem to be adaptive possibilities present allowing the
> claimant to work.  If she knows that her symptoms occur with prolonged
> standing, then one obvious, common solution is not to stand for a prolonged
> period.

(Doc. 49, Ex. 5 at 695.) As a result, Provident denied plaintiff's claim for benefits "[b]ecause

the medical records do not support restrictions and limitations to preclude Ms. Allen from

working in her occupation;" therefore, Provident found that plaintiff did "not meet the

definition of disability." (*Id.* at 703.)

Dr. Hashway's finding that there is no objective evidence of the presence of syncope is not supported by substantial evidence. As set forth above, numerous treating or consulting physicians noted plaintiff suffered from recurrent and unpredictable syncope. Indeed, nothing in the medical evidence indicates that plaintiff is *not* actually experiencing recurrent and unpredictable syncopal attacks. Also, according to Dr. Hashway, plaintiff's "own occupation" requires standing or walking for 2/3 of the day for a 60 hour week. (*See id*. at 448.) Therefore, the proposed limitation in his report dated September 17, 2001, – the so-called "obvious, common solution" – that plaintiff should "not stand for a prolonged period of time," (*id*. at 695), is inconsistent his December 21, 2000 finding that plaintiff was able to stand and/or to walk "for 2/3 of the day for a 60 hour week," (*id*. at 448).

For the reasons set forth above, the court finds that Provident's decision to deny plaintiff long-term disability benefits is without reason and is not supported by substantial evidence; therefore, Provident's decision to deny plaintiff's claims for benefits was arbitrary and capricious. Thus, Provident's Motion for Summary Judgment will be denied.

## C. REMAND

Based on the foregoing, the court finds that this matter is due to be remanded to the administrator with instructions that the administrator acknowledge liability at least until September 19, 2001, and for such additional time as the record may show that plaintiff's condition has worsened or remained the same.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no genuine issues of material facts in dispute, and defendants Amdahl Corporation and DMR Consulting Group Long Term Disability Plan are entitled to judgment as a matter of law. However, the court finds that defendant Provident Corporation's decision to deny plaintiff long-term disability benefits was arbitrary and capricious; therefore, defendant Provident Corporation's Motion for Summary Judgment is due to be denied. The court will enter an Order granting the Motions for Summary Judgment filed by Amdahl Corporation and DMR Consulting Group Long Term Disability Plan; denying Provident's Motion for Summary Judgment; and remanding this matter to Provident, as administrator of the Plan, with instructions that it award benefits to plaintiff under the Plan from the time her benefits were terminated until September 19, 2001, and for such additional time as the record may show that plaintiff's condition has worsened or remained the same.[8]

**DONE** this ___31st___ day of March, 2004.

_Sharon Lovelace Blackburn_
**SHARON LOVELACE BLACKBURN**
United States District Judge

---

[8]As a final note, the litigants and their respective counsel have waited far too long for this decision. The court has no excuse and makes none for the delay in resolving this matter, knowing full well how difficult it is for the parties to make any informed choices about how to proceed when confronting the uncertainty of pending legal issues. It is the court's hope that no party has experienced undue expense or anxiety during this period of unjustifiable delay.